# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **ALICE J. NEUEN, et al.,** | : | **CIVIL ACTION** |
| **Plaintiffs,** | : | |
| | : | |
| **v.** | : | **No.: 09-cv-5090** |
| | : | |
| **PRIMECARE MEDICAL, INC, et al.** | : | |
| **Defendants.** | : | |

## M E M O R A N D U M

**SITARSKI, M.J.**                                                **March 24, 2011**

Currently pending before the Court is a motion for summary judgment filed by

Defendants PrimeCare Medical, Inc., Paula Dillman-McGowan, CRNP, and Faye Oxenreider,

LPN. For the following reasons, the motion will be GRANTED in part and DENIED in part.


## I.      INTRODUCTION

Plaintiffs filed their Complaint on November 5, 2009, against Berks County, Berks

County Prison, Sergeant J. Franklin, PrimeCare Medical, Inc., Mildred Karanja, LPN, Paula

Dillman-McGowan, CRNP, and Faye Oxenreider, LPN. This matter initially was assigned to

District Court Judge Juan R. Sanchez. On March 23, 2010, the parties consented to the exercise

of jurisdiction by a United States Magistrate Judge under 28 U.S.C. 636(c) and Fed.R.Civ.P. 73,

and the matter was referred to me. (Doc. No. 23).

On October 12, 2010, the Court approved the parties' stipulation for voluntary dismissal

of Mildred Karanja, LPN. (Doc. No. 30). On October 14, 2010, the Court also approved the

parties' stipulation for voluntary dismissal of Sergeant J. Franklin. (Doc. No. 31). And, on

January 11, 2011, the Court approved the parties' stipulation for voluntary dismissal of Berks County and Berks County Prison. (Doc. No. 38). Thus, the claims remaining in this matter are those pending against PrimeCare Medical, Inc. ("PrimeCare"), Paula Dillman-McGowan, CRNP, and Faye Oxenreider, LPN (collectively, "Defendants"). Those claims are: the alleged violations of 42 U.S.C. §1983 for deliberate indifference to Alice Neuen's serious medical needs while incarcerated (Counts I and II), medical negligence (Count III), and Loss of Consortium (Count VI).[1]

On December 14, 2010, following the completion of discovery, Defendants filed the instant Motion for Summary Judgment. (Doc. No. 32). Defendants move for summary judgment on the grounds that Plaintiffs are unable to show that Nurse Dillman-McGowan and Nurse Oxenreider acted with deliberate indifference to Ms. Neuen's serious medical need or that a policy or custom of PrimeCare caused a constitutional violation. *See* Def.'s Br. in Sup. at 4-5. Defendants also argue that Plaintiffs' supplemental state law claims should be dismissed in the event that the Court grants summary judgment on the federal claims. *Id.* at 7. On January 4, 2011, Plaintiffs filed their Answer to Defendants' Motion. (Doc. No. 36). The Court heard oral argument on January 21, 2011. (Doc. No. 39). By order dated February 10, 2011, the Court denied Defendants' request for dismissal of the supplemental state law claims based on considerations of judicial economy, and the Court set trial for April 25, 2011. Accordingly, this matter is now ripe for disposition.

---

[1] Plaintiffs' Complaint also set forth a cause of action for violations of the American with Disabilities Act and section 504 of the Rehabilitation Act (Count IV), and for negligence pursuant to the Political Subdivision Tort Claims Act (Count V). However, Counts IV and V named only Berks County and Berks County Prison, which have been dismissed.

## II. BACKGROUND[2]

Alice Neuen, an insulin dependent diabetic, was incarcerated on April 18, 2008. Comp. ¶¶ 13, 17; Plt.'s Memo., Ex. A. The prison medical records indicate that, at the time of her incarceration, Ms. Neuen had peripheral vascular disease with risk factors including obesity, hypertension, hyperlipidemia, and diabetic neuropathy. Plt.'s Memo., Ex. G. Ms. Neuen had undergone successful arterial bypass surgery on her right leg a couple of weeks before her incarceration, and she was scheduled to see her treating physician, Robert A. Brigham, M.D., for similar treatment of her left leg. Comp. ¶¶ 15-16, 18; Neuen Dep. at 46. The appointment for the left leg was scheduled for April 21, 2008. *Id*.; Plt.'s Memo., Ex. C. Immediately upon her incarceration on April 18, Ms. Neuen informed PrimeCare employees of the medical status of both legs, including the April 21 appointment to address her left leg. Neuen Dep. at 46. Ms. Neuen also completed PrimeCare's Receiving Screening/Health Assessment form and indicated that she required a medical referral with respect to the "bypass done on 4/4/08." Def.'s Mot., Ex. A. As set forth in detail below, Ms. Neuen did not receive a physical examination of her lower extremities during the first three days of her incarceration; Ms. Neuen was prevented from keeping her appointment with her treating physician; and she was not seen by a prison physician until April 30, 2008. Comp. ¶ 19; A.Neuen Dep. at 46-47, 56-57; Plt.'s Memo., Ex. I; Gessner Dep. at 91.

On April 21, 2008, three days after Ms. Neuen was incarcerated, PrimeCare employees performed a physical examination of Ms. Neuen's lower extremities. *Id*.; Plt.'s Memo., Ex. G.

---

[2] Except as otherwise noted, the following facts are undisputed, or are taken in the light most favorable to the Plaintiffs.

3

Nurse Dillman-McGowan examined Ms. Neuen and noted "PVD [peripheral vascular disease]." Plt.'s Memo., Ex. G. During her examination, Nurse Dillman-McGowan was unable to palpate (feel) or auscultate (hear) a pulse in the left foot. Plt.'s Memo., Ex. G. Nurse Dillman-McGowan found that the left foot was cold to the touch, and exhibited rubor (redness) and erythema (redness caused by dilation and congestion of the capillaries). Id.; Dillman-McGowan Dep. at 97-99. Nurse Dillman-McGowan testified that she did not know how long these conditions existed in Ms. Neuen's left foot, and the medical records do not reflect any inquiry or information in that regard. Dillman-McGowan Dep. at 99. However, Nurse Dillman-McGowan testified that "[i]f this were something new and the patient had reported that this was something new, it would have been an urgent referral." Id. Nurse Dillman-McGowan was taught to recognize the signs and symptoms of peripheral vascular disease and treat them as soon as possible to avoid the progression to gangrene. Dillman-McGowan Dep. at 68-69. With regard to the right foot, Nurse Dillman-McGowan noted a Stage I ulcer and "necrosis oozing" on the first digit. Plt.'s Memo, Ex. G. Nurse Dillman-McGowan then ordered Silvadene[3] for the left foot, Tegaderm[4] for the right foot, and Neurontin.[5] Def.'s Mot., Ex. E. Nurse Dillman-McGowan

---

[3] Silvadene "is a soft white, water-miscible cream containing the antimicrobial agent silver sulfadiazine." Physicians' Desk Reference ( "PDR" ) 1752 (62d ed. 2008).

[4] Tegaderm is "[a] thin, clear sterile dressing that keeps out water, dirt and germs, yet lets skin breathe. It's the number one hospital brand transparent dressing in the U.S." 3m.com, available at: http://www.3m.com/product/information/Nexcare-Tegaderm-Transparent-Dressing.html (Last visited 03/24/2011).

[5] Neurontin "is indicated for the management of postherepetic neuralgia in adults." Physicians' Desk Reference ( "PDR" ) 2463 (62d ed. 2008). Postherepetic neuralgia "is a painful condition affecting your nerve fibers and skin . . . Postherpetic neuralgia is a complication of shingles . . . ." Mayoclinic.com, available at: http://www.mayoclinic.com/health/postherpetic-neuralgia/DS00277 (last visited 03/24/2011).

testified that she believed that Ms. Neuen did not need further evaluation or treatment on April 21, 2008. Dillman-McGowan Dep. at103-104. However, Nurse Dillman-McGowan told Ms. Neuen that she was "going to see the [prison] doctor Wednesday, [April] 23rd." A.Neuen Dep. at 69.

During the examination on April 21, Ms. Neuen advised Nurse Dillman-McGowan that she was concerned about keeping her appointment with Dr. Brigham, which was scheduled for that same day, April 21. A.Neuen Dep. at 62-63; Plt.'s Memo, Exs. C & I. Nurse Dillman-McGowan told Ms. Neuen that she would "take care" of the appointment with Dr. Brigham, and she would call his office to change the appointment. Plt.'s Memo., Ex. I. Nurse Dillman-McGowan noted an order to "obtain old records [from] . . . Dr. Brigham," which was marked "done" in an unidentified hand. Def.'s Mot., Ex. E. At the direction of Nurse Dillman-McGowan, Ms. Neuen completed an Authorization For Release of Health Information, which included a request to "please cancel appt. for today. BCP [Berks County Prison] will reschedule." Plt.'s Memo., Ex. G; Transcript dated Jan. 21, 2011, p. 8. The Authorization form was faxed to Dr. Brigham's office by Nurse Oxenreider; however, neither practitioner followed up with a call to Dr. Brigham's office. Dillman-McGowan Dep. at 44-47; Plt.'s Memo., Exs. A & F. Nurse Dillman-McGowan testified that, as a matter of policy, the only interaction she would have with a prisoner's outside physician in terms of obtaining information about the patient's condition would be to send a medical records request. Dillman-McGowan Dep. at 41-42. Aside from this reference to Nurse Dillman-McGowan's use of the word "policy," there is no evidence of record concerning PrimeCare's policies governing provision of medical services at the Berks County Prison.

On April 21, 2008, Nurse Oxenreider also examined Ms. Neuen's lower extremities and completed a Wound Identification Chart. Plt.'s Memo., Ex. G; Transcript dated Jan. 21, 2011, p. 10; Oxenreider Dep. at 21-22. Nurse Oxenreider noted a wound on the toes of the left foot and wounds on the right foot. *Id*. Nurse Oxenreider also bathed Ms. Neuen and administered medication and dressing changes on other unspecified occasions. Oxenreider Dep. at 10.

On April 22, 2008, Ms. Neuen completed a Sick Call Request stating, "want to discuss [right] great toe and pain in left foot." Plt.'s Memo., Ex. G. The next day, on April 23, Nurse Dillman-McGowan spoke with Ms. Neuen in her cell and examined the dressing on Ms. Neuen's right toe. Dillman-McGowan Dep. at 160. Nurse Dillman-McGowan recorded Ms. Neuen's symptoms and noted "await old records . . . [follow up with] Dr. Gessner as previously scheduled." Def.'s Mot., Ex. E. There is no indication in the record that any documents were ever received from the outside medical providers. On that same date, Nurse Dillman-McGowan reported that Ms. Neuen complained of "severe" "burning pain" in her left foot, but a physical examination of the left foot was not conducted. Plt.'s Memo., Ex. G; Dillman-McGowan Dep. at 160. Nurse Dillman-McGowan did not consider whether the severe burning pain of the left foot on April 23 was a new finding, in addition to the previously noted symptoms. Dillman-McGowan Dep. at 159.

The prison physician, Victoria Gessner, M.D., was working at the prison on April 23, 2008, but Ms. Neuen was not referred to her care on that day, as had been promised by Nurse Dillman-McGowan. Gessner Dep. at 43; A.Neuen Dep. at 69. Ms. Neuen's diary entry dated April 23, 2008, states "[m]y left leg hurting a lot." Plt.'s Memo., Ex. I. The Dispensary Cards

indicate that Ms. Neuen was ordered to receive Robaxin[6] and Ultram[7] beginning April 23, 2008. Def.'s Mot., Ex. E.

Ms. Neuen's left foot was not examined for the next several days, during which time Ms. Neuen's pain and symptoms in her left foot continued to increase. Plt.'s Memo., Ex. I. Ms. Neuen's diary entry dated April 25, 2008, states that she asked the night nurse to please contact her surgeon and that she was "in so much pain." Plt.'s Memo., Ex. I. On April 26, 2008, Ms. Neuen made a single diary entry: "Nothing New - still no word about my surgery - I keep asking - no response." *Id.* Ms. Neuen's diary entry on April 27, 2008, states "I hurt so bad I'm afraid I'm going to die." *Id.* On that same day, Mr. Neuen visited his wife in the prison, and he observed that the toes on her left foot "were black and her nails were oozing." L.Neuen Dep. at 20. Ms. Neuen's diary entry the next day, April 28, 2008, also states that her toes were turning black. Plt.'s Memo., Ex. I.

The next medical record concerning Ms. Neuen's left foot is dated April 29, 2008, when Silvadene was applied to the left foot. Def.'s Mot., Ex. E. A Sick Call report on that same day noted that Ms. Neuen exhibited "symptoms of anxiety verbally not responding." Def.'s Mot., Ex. E.

---

[6] Robaxim or "Methocarbamal is a muscle relaxant. It works by blocking nerve impulses (or pain sensations) that are sent to your brain. It has no direct effect on the muscle. Methocarbamol is used together with rest and physical therapy to treat skeletal muscle conditions such as pain and discomfort caused by sprains and strains." Drugs.com, Methocarbamal, available at: http://www.drugs.com/methocarbamol.html (Last visited 03/24/2011).

[7] Ultram "is indicated for the management of persistent, moderate to severe chronic pain that requires continuous, around-the-clock opioid administration for an extended period of time, and cannot be managed by other means . . . ." Physicians' Desk Reference ( "PDR" ) 2353 (62d ed. 2008).

The next day, on April 30, 2008 computerized medical records indicate that Joetta Kline, a PrimeCare employee, placed a call to Dr. Brigham's office. Def.'s Mot., Ex. E. The record contains two entries concerning this contact with Dr. Brighman's office. First, Ms. Kline noted that "Dr. Brigham's office will be sending notification in June 2008 when next follow up appointment is due." *Id*. Second, an "Appointment Description" states, "nursing please contact Dr. Brigham's office[.] Can they send records? When should pt be seen? Pt reports just havin[g] fempop bypass 4/1/08. Please task to CRNP note re results of conversation?" The "Appointment Change Note" for that same entry states, "Jo placed call to Dr. Brigham's office to [follow up] about [appointment]. [Inmate] is a [patient] with this doctor." *Id*.

Ms. Neuen's left foot was finally examined by the prison physician, Dr. Gessner, on April 30, 2008. Gessner Dep. at 143. At that time, the possible presence of a blister on the toes and "the entire clinical picture made [Dr. Gessner] concerned for the vascular integrity of that foot." Gessner Dep. at 143. Consequently, Dr. Gessner recommended Ms. Neuen's immediate transfer to the Reading Hospital emergency room, which took place with the approval of the corporate vice president who happened to be at the prison that same day. *Id*. at 147.

At Reading Hospital, Ms. Neuen was noted to have "gangrenous changes on her toes and was anticoagulated with [H]eparin.[8]" Plt.'s Memo., Ex. A. Plaintiffs' expert, Paul E. Collier, M.D., opined that the delay in treatment "allowed the vascular occlusions to progress leading to the development of gangrenous changes." *Id*. Left leg bypass surgery was performed on May 2, 2008, but there was no improvement in the flow to her left foot. *Id*. On May 12, 2008, Ms.

---

[8] "Heparin is an anticoagulant (blood thinner) that prevents the formation of blood clots." Drugs.com, Heparin, available at: http://www.drugs.com/heparin.html (Last visited 03/24/2011).

Neuen underwent a left leg below the knee amputation.  *Id*.


III.    **STANDARD OF REVIEW**

Summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A fact is "material" if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  An issue is "genuine" if there is sufficient evidence from which a jury could find in favor of the non-moving party.  *Id.* at 248-29.  It is not the court's role to weigh the disputed evidence and decide which is more probative, or to make credibility determinations.  Rather, the court must consider the evidence, and all reasonable inferences which may be drawn from it, in the light most favorable to the non-moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) *(citing U.S. v. Diebold, Inc.*, 369 U.S. 654, 655 (1962)); *Tigg Corp. v. Dow Corning Corp.*, 822 F.2d 358, 361 (3d Cir. 1987).  If a conflict arises between the evidence presented by both sides, the court must accept as true the allegations of the non-moving party, and "all justifiable inferences are to be drawn in his favor."  *Anderson,* 477 U.S. at 255.

The moving party bears the initial burden of demonstrating that there is no genuine issue of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-24 (1986).  Once the moving party carries this initial burden, the non-moving party must "come forward with specific facts showing there is a genuine issue for trial."  *Matsushita Elec. Indus. Co.*, 475 U.S. at 587.  The non-moving party must present something more than mere allegations, general denials, vague statements, or suspicions.  *Trap Rock Indus. v. Local* 825, 982 F.2d 884, 890 (3d Cir. 1992);  *Fireman's Ins.*

*Co. of Newark v. DuFresne*, 676 F.2d 965, 969 (3d Cir. 1982).  Instead, the non-moving party must present specific facts and "affirmative evidence in order to defeat a properly supported motion for summary judgment."  *Anderson*, 477 U.S. at 257.  "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted."  *Id.* at 249-50. If the non-moving party has the burden of proof at trial, then that party must establish the existence of each element on which it bears the burden.  *Celotex Corp.*, 477 U.S. at 322-23.

## IV.    DISCUSSION

### A.    Liability of Nurse Dillman-McGowan and Nurse Oxenreider.

In order to state a claim for relief pursuant to Section 1983, "a plaintiff must demonstrate the defendant, acting under color of state law, deprived him or her of a right secured by the Constitution or the laws of the United States."  *Kaucher v. Cnty. of Bucks*, 455 F.3d 418, 423 (3d Cir. 2006).  Plaintiffs claim that Defendants' failure to provide Ms. Neuen with necessary medical treatment during her incarceration violates her rights under the Eighth Amendment.

The Eighth Amendment requires prison officials to provide adequate medical treatment to inmates.  *Estelle v. Gamble*, 429 U.S. 97, 104 (1976).  To prevail on an Eighth Amendment violation related to medical treatment, an inmate must establish that: (1) the medical need was serious; and (2) the acts or omissions by prison officials demonstrated "deliberate indifference" to the inmate's health or safety.  *Id*.  A medical need is "serious" if it is "one that has been diagnosed by a physician as requiring treatment or one that is so obvious that a lay person would easily recognize the necessity for a doctor's attention."  *Monmouth Cty. Corr. Inst. Inmates v. Lanzaro*, 834 F.2d 326, 347 (3d Cir. 1987) (internal quotations and citations omitted).  Thus, an

Eighth Amendment claim stemming from medical care requires the plaintiff to establish both an objective element (that Plaintiff had "serious medical needs" at the relevant time and that the alleged deprivation of treatment for those needs was also "sufficiently serious") and a subjective element (that Dillman-McGowan and Oxenreider acted with "a sufficiently culpable state of mind"). *Spruill v. Gillis*, 328 Fed.Appx. 797, 801 (3d Cir. 2009) (*citing Wilson v. Seiter*, 501 U.S. 294, 297 (1991); *see also Brown v. DiGuglielmo*, 2011 WL 944418 at *3 (3d Cir. Mar. 21, 2011).

To qualify as deliberate indifference, an official must actually know of – and disregard – an excessive risk to the health of an inmate. *Farmer v. Brennan*, 511 U.S. 825, 829 (1994); *see also Baker v. Lehman*, 932 F.Supp. 666, 670 (E.D.Pa.1996) (The test "is whether the defendants were aware of facts from which they could draw the inference that a substantial risk of serious harm existed, and whether they drew that inference.") The "subjective knowledge on the part of the official can be proved by circumstantial evidence to the effect that the excessive risk was so obvious that the official must have known of the risk." *In re Bayside Prison Litigation*, 341 Fed.Appx. 790, 795-96 (3d Cir. 2009); *see also Beers-Capitol v. Whetzel*, 256 F.3d 120, 133 (3d Cir. 2001). To prevail on the subjective element, it is not enough to establish "malpractice," or a professional "disagreement as to the proper treatment" for the underlying medical condition. *Lanzaro*, 834 F.2d at 346. (internal quotation marks omitted). The defendant may rebut a prima facie demonstration of deliberate indifference either by establishing that, although he did know of the risk, he took reasonable steps to prevent the harm from occurring. *Whetzel*, 256 F.3d at 133.

Here, the parties agree that Nurse Dillman-McGowan and Nurse Oxenreider were acting under color of law in their interactions with Ms. Neuen. Transcript dated Jan. 21, 2011, p. 21-22.

The undisputed facts also show that Ms. Neuen presented with a serious medical need during her incarceration.[9]  Therefore, the Court will address whether Nurse Dillman-McGowan and Nurse Oxenreider acted with deliberate indifference to Ms. Neuen's serious medical need.

Defendants assert that Ms. Neuen received some medical attention, and the present dispute concerns only the adequacy of the treatment, which generally does not give rise to a civil rights cause of action.  Def.'s Br. at 3.  Defendants argue that Plaintiffs merely disagree with the course of treatment carried out, in an exercise of professional judgment, by Nurse Dillman-McGowan and Nurse Oxenreider.  *Id*.  On the other hand, Plaintiffs assert that Defendants simply documented Ms. Neuen's medical condition (peripheral vascular disease), but did not provide any relevant treatment.  Plt.'s Memo. at 8-12.  Plaintiffs also assert that Defendants prevented Ms. Neuen from seeing a physician during the first twelve days of her incarceration, during which time Ms. Neuen suffered extreme pain and her condition deteriorated significantly.  *Id*.  Thus, Plaintiffs argue that Defendants acted with deliberate indifference by failing to provide relevant treatment and by preventing Ms. Neuen from receiving the necessary medical treatment prescribed by Dr. Brigham.  Plt.'s Memo. at 8-12; Transcript dated Jan. 21, 2011, p. 22-23.

As noted above, deliberate indifference will be found where prison officials "intentionally deny[ ] or delay [ ] access to medical care or intentionally interfere[ ] with the treatment once

---

[9]  As set forth above, Ms. Neuen is an insulin dependent diabetic with peripheral vascular disease.  At the time of her incarceration, she presented with lower extremities requiring arterial bypass surgery, which Dr. Brigham had already performed on her right leg, and was scheduled to be performed on her left leg.  Defendants do not challenge the seriousness of Ms. Neuen's medical need.  *See* Def.'s Br. at 1-5; Transcript dated Jan. 21, 2011, p. 21.  Moreover, the Third Circuit has recognized that a medical need is serious if it is "one that has been diagnosed by a physician as requiring treatment or one that is so obvious that a lay person would easily recognize the necessity for a doctor's attention." *Woloszyn v. County of Lawrence*, 396 F.3d 314, 320 (3d Cir.2005).

prescribed." *Hankey v. Wexford Health Sources, Inc.*, 383 Fed.Appx. 165, 168 (3d Cir. 2010)

*quoting Estelle*, 429 U.S. at 104-05; *see also Inmates of Allegheny County Jail v. Pierce*, 612

F.2d 754, 762 (3d Cir. 1979).  Further, as the Third Circuit has explained:

> Acting with "reckless disregard" to a substantial risk of serious
> harm to a prisoner is consistent with deliberate indifference.  *See
> Farmer*, 511 U.S. at 836.  This Court has found that the standard is
> met when prison officials: 1) deny reasonable requests for medical
> treatment, and the denial exposes the inmate to undue suffering or
> the threat of tangible residual injury, 2) delay necessary medical
> treatment for non-medical reasons, 3) erect arbitrary and
> burdensome procedures that result in interminable delays and
> outright denials of care, or 4) prevent an inmate from receiving
> recommended treatment for serious medical needs, or deny access
> to a physician capable of evaluating the need for treatment.  *See
> Lanzaro*, 834 F.3d at 346-47; *see also Durmer v. O'Carroll*, 991
> F.2d 64, 68 (3d Cir. 1993).

*Cooleen v. Lamanna*, 248 Fed. Appx. 357, 360 (3d Cir. 2007).

Taken in the light most favorable to the Plaintiff, the record demonstrates that Ms. Neuen

requested access to medical care prescribed by Dr. Brigham; Ms. Neuen made Defendants aware

that medical care was due; Ms. Neuen complained of pain and discomfort to Defendants;

Defendants failed to provide access to the prescribed care; and Ms. Neuen's condition worsened

over time.[10]   The record also establishes that the treatment ordered by Dr. Brigham was delayed,

purportedly because Dr. Brigham's medical records first needed to be obtained from him.  Thus,

taking the facts in the light most favorable to Plaintiff, there is evidence from which a jury could

---

[10] Ms. Neuen repeatedly reminded prison officials about her medical appointment,
including during Nurse Dillman-McGowan's examination on April 21, 2008.  Neuen Dep. at 62-
63; Plt.'s Memo., Ex. I.  Nurse Dillman-McGowan acknowledged this scheduled treatment and
told Ms. Neuen that she would "take care" of Ms. Neuen's scheduled appointment with Dr.
Brigham.  Plt.'s Memo., Ex. I.  Instead, Nurse Oxenreider *cancelled* Ms. Neuen's medical
appointment at the direction of Nurse Dillman-McGowan.  Plt.'s Memo., Ex. F.

find that Ms. Neuen requested medical care, but Nurses Dillman-McGowan and Oxenreider delayed necessary medical treatment for non-medical reasons, and such delay exposed Ms. Neuen to undue suffering, and increased the risk of tangible injury. There is evidence from which a jury might conclude that Defendants erected arbitrary and burdensome procedures that resulted in needless delays and outright denials of care.

Plaintiffs thus present sufficient evidence to survive summary judgment, because "whether or not a defendant's conduct amounts to deliberate indifference has been described as a classic issue for the fact finder." *Goodrich v. Clinton County Prison*, 214 Fed.Appx. 105, 111 (3d Cir. 2007) (*quoting A.M. ex. rel. J.M.K. v. Luzerne County Juvenile Detention Ctr.*, 372 F.3d 572, 588 (3d Cir. 2004)). Accepting as true that Ms. Neuen received inadequate medical care, the intent of Nurse Dillman-McGowan and Nurse Oxenreider becomes critical: if the inadequate care was simply an error in medical judgment on their part, Ms. Neuen's claim must fail. But, if, for example, the failure to provide adequate care was deliberate, and motivated by non-medical factors, then Ms. Neuen has a viable Eighth Amendment claim. It is therefore important that the trier of fact hear Nurse Dillman-McGowan and Nurse Oxenreider's testimony in order to assess their credibility. *Durmer*, 991 F.2d at 69.

This is particularly true, given the questions of fact that exist concerning the medical care that actually was provided to Ms. Neuen during the first twelve days of her incarceration. Defendants assert that Ms. Neuen was provided "immediate, continued and extensive medical treatment," but Plaintiffs argue that no relevant care was provided with respect to the circulatory problem in the left leg. Def.'s Br. at 4; Plt.'s Memo. at 11-12. It is for the fact-finder to determine whether the treatment given to Ms. Neuen prior to April 30, 2008 was relevant to the

serious medical condition, or whether the medical care was "so woefully inadequate as to amount to no treatment at all." *Keohane v. Lancaster County*, No. 07-3175, 2010 WL 3221861, at *11 (E.D. Pa. Aug. 13, 2010) (*citing Sturts v. City of Philadelphia*, 529 F.Supp.434, 438 (E.D. Pa. 1982)). The record shows that certain medications were prescribed and some attention was given to the wounds on Ms. Neuen's feet, but it is Plaintiffs position is that the treatment provided - dressing changes, application of a topical antimicrobial cream, and pain management medication - is akin to <u>no</u> treatment of the actual diagnosed medical condition. It is for the jury to determine whether Nurse Dillman-McGowan and/or Nurse Oxenreider subjectively believed that the medical care they rendered to Ms. Neuen was responsive to the diagnosed condition of peripheral vascular disease.[11]

Accordingly, the Court cannot conclude that Nurse Dillman-McGowan and Nurse Oxenreider's actions were consistent with the Eighth Amendment. The individual defendants' motion for summary judgment is denied.

**B.    Liability of PrimeCare**.

Private entities that contract with municipalities to provide services to prison inmates, as well as employees of those entities, are acting "under color of state law." *See West v. Atkins*, 487 U.S. 42, 53-58 (1988) (physician under contract to provide medical services at prison acted under color of state law). Indeed, Defendants concede that they were acting under color of state law.

---

[11]   On April 21, Nurse Dillman-McGowan ordered Silvadene, an antimicrobial cream, applied to the left foot, and Neurontin, which is usually indicated for pain management of a nerve and skin condition. Nurse Oxenreider also administered dressing changes on unspecified occasions. Finally, on April 23, Robaxin, a muscle relaxant, and Ultram, also for pain management, were administered. However, it is for the jury to determine whether Defendants subjectively believed that this course of treatment was an appropriate response to diagnosed peripheral vascular disease.

Thus, we analyze the §1983 claim against PrimeCare under §1983's municipal liability standards. *See Natale v. Camden County Correctional Facility,* 318 F.3d 575, 583 (3d Cir. 2003) (analyzing claim against defendant health care provider under *Monell* standard); *see also Thomas v. Zinkel,* 155 F.Supp.2d 408 (E.D.Pa. 2001); *Rye v. Erie County Prison,* 689 F.Supp.2d 770, 780 (W.D.Pa. 2009); *Miller v. Hoffman*, No. 97-7987, at *4 (E.D.Pa. July 7, 1998).

"A municipality cannot be held liable *solely* because it employs a tortfeasor–or, in other words, a municipality cannot be held liable under § 1983 on a *respondeat superior* theory." *Monell v. Dep't of Social Services*, 436 U.S. 658, 691 (1978). The Third Circuit has succinctly explained *Monell* liability as follows:

> *Monell* thus created a "two-path track" to municipal liability, depending on whether a § 1983 claim is premised on a municipal policy or custom. *Id.*

> In *Andrews v. City of Philadelphia*, we expanded on these two sources of liability:

>> A government policy or custom can be established in two ways. Policy is made when a 'decisionmaker possess[ing] final authority to establish a municipal policy with respect to the action' issues an official proclamation, policy, or edict. A course of conduct is considered to be a 'custom' when, though not authorized by law, 'such practices of state officials [are] so permanently and well-settled' as to virtually constitute law.

> 895 F.2d 1469, 1480 (3d Cir.1990) (quoted in *Beck,* 89 F.3d at 971) (citations omitted). Custom requires proof of knowledge and acquiescence by the decisionmaker. *Watson v. Abington Twp.*, 478 F.3d 144, 154 (3d Cir.2007); *Beck v. City of Pittsburgh*, 89 F.3d 966, 971 (3d Cir. 1996).

*McTernan v. City of York,* 564 F.3d 636, 657-58 (3d Cir. 2009).

A plaintiff must "present scienter-like evidence of indifference on part of a particular policymaker or policymakers." *Simmons v. City of Phila.*, 947 F.2d 1042, 1060-61 (3d Cir.1991). "The requirement of producing scienter-like evidence on the part of an official with

policymaking authority is consistent with the conclusion that 'absent the conscious decision or deliberate indifference of some natural person, a municipality, as an abstract entity, cannot be deemed to have engaged in a constitutional violation by virtue of a policy, a custom or failure to train.'" *Beswick v. City of Phila.*, 185 F.Supp.2d 418, 427 (E.D.Pa.2001) (*quoting Simmons v. City of Philadelphia*, 947 F.2d 1042, 1063 (3d Cir. 1991)). Plaintiffs bear the burden of showing that an official who has the power to make policy is responsible for either the affirmative proclamation of a policy or acquiescence in a well-settled custom. *Andrews*, 895 F.2d at 1480; *see also Jett v. Dallas Independent School District*, 491 U.S. 701 (1989) (municipal liability attaches where a policymaker has acquiesced "in a longstanding practice or custom which constitutes the 'standard operating procedure' of the local government entity").

In sum, "[t]o establish municipal liability under *Monell*, a plaintiff must identify the challenged policy, [practice, or custom,] attribute it to the [municipality] itself, and show a causal link between the execution of the policy, [practice, or custom,] and the injury suffered." *Beswick*, 185 F.Supp.2d at 427 (internal quotation omitted).[12]

Here, Plaintiffs claim that PrimeCare "established and maintained a policy, practice or custom which directly caused [Ms. Neuen's] constitutional harm." Plt.'s Memo. at 13 (*citing Stoneking v. Bradford Area School Dist.*, 882 F.2d 720, 725 (3d Cir. 1989)(*citing Monell*, 436 U.S. at 690-91). Specifically, Plaintiffs assert that PrimeCare had a policy, custom or practice that prevented its employees from directly contacting an outside medical provider until medical records were first received from the outside provider. Plt.'s Memo. at 13-14. At oral argument,

---

[12] As noted above, this policy, practice or custom standard also applies to private corporations which provide healthcare to prisoners under a contract. *See Natale*, 318 F.3d at 583; *see also Malles v. Lehigh County*, 639 F.Supp.2d 566, 576 (E.D.Pa. 2009).

Plaintiffs' counsel confirmed that the allegedly constitutionally deficient policy was the failure to

do anything until a prisoner's medical records were received from an outside provider.

Transcript dated Jan. 21, 2011, p. 30-34.

Plaintiffs have not adduced evidence of any official policy, or any officially-sanctioned

custom or practice, in support of their claim against PrimeCare. Plaintiffs instead rely on the

testimony of Nurse Dillman-McGowan. Plt.'s Br., p. 13-14. The testimony relied upon by

Plaintiffs is as follows:

> Q: So let me be clear here. So it's your understanding that there's no way that you can have a patient sign an authorization, fax it to a doctor and then talk to that doctor about the patient's condition?
>
> A: I do not do that. And to the best of my knowledge, other providers do not do that.
>
> Q: So that's not done here at Berks County Prison; is that right?
>
> A: To my knowledge, no.
>
> Q: No matter how urgent or what the nature is of the patient's condition, correct?
>
> A: Correct.
>
> Q: The only interaction that you have as a matter of policy here at Berks County Prison is to send a medical request and then wait for those records to arrive in terms of obtaining information about a patient's condition from an outside provider?
>
> A: Correct.
>
> . . .
>
> Q: So if a patient arrives and they say they have, for example, an urgent appointment with a surgeon, am I correct that your typical response would be to simply order the records from that surgeon?
>
> A: To confirm the appointment obtaining the records, yes.
>
> Q: And you wouldn't do anything until after those records came back; is that right?
>
> A: I would not reschedule an appointment until the records were received.

Dillman-McGowan Dep. at 41-44.  When asked if she knows whether the PrimeCare nurses call to follow up on a faxed records request, Nurse Dillman-McGowan testified, "I do not know that, no."  Dillman-McGowan Dep. at 47.

Thus, Nurse Dillman-McGowan's testimony - the only evidence offered by Plaintiffs in support of their municipal liability claim[13] - does not illuminate the critical inquiry.  She offered no testimony explaining PrimeCare's official policy.  Moreover, even if she had attempted to articulate the official policy, this testimony, standing alone, would not necessarily constitute sufficient "policy" evidence, since municipal liability is established by "officials 'whose acts or edicts may fairly be said to represent official policy.'"  *Pembaur v. City of Cincinnati*, 475 U.S. 469, 480 (1986).  Nurse Dillman-McGowan is not a policymaker, and her acts and edicts alone do not constitute official policy.  Plaintiffs simply have not adduced sufficient "policy" evidence in the present case.

Alternatively, *Monell* liability might be premised upon a constitutionally-deficient "custom" or "practice."  "Custom . . . can be proven by showing that a given course of conduct, although not specifically endorsed or authorized by law, is so well-settled and permanent as virtually to constitute law."  *Bielevicz v. Dubinon*, 915 F.2d 845, 850 (3d Cir. 1990) (*citing Andrews*, 895 F.2d at 1480).

Plaintiffs have adduced no evidence to show that the conduct complained of here was

---

[13]  During oral argument, Plaintiffs' counsel asserted that Nurse Oxenreider may have also testified to the allegedly constitutionally deficient policy, but Plaintiffs failed to present evidence of any such testimony by Nurse Oxenreider.  *See* Transcript dated Jan. 21, 2011, p. 31-33.  The Court has reviewed the available excerpts of Nurse Oxenreider's deposition testimony, but the Court was unable to identify any testimony relative to this issue.  *See* Def.'s Mot., Ex. L; Plt.'s Memo., Ex. J.  Thus, the only evidence of the alleged policy, custom or practice is the testimony of a single employee, Nurse Dillman-McGowan.

consistent with some widespread, officially-sanctioned custom or practice. A custom under *Monell* usually cannot be established by a one-time occurrence. *See Oklahoma City v. Tuttle*, 471 U.S. 808, 823-24 (1985)("[A] single incident of unconstitutional activity is not sufficient to impose liability under *Monell*, unless proof of the incident includes proof that it was caused by an existing, unconstitutional municipal policy, which policy can be attributed to a municipal policymaker."); s*ee also Losch v. Borough of Parkesburg*, 736 F.2d 903, 911 (3d Cir. 1984)( "a policy cannot ordinarily be inferred from a single instance of illegality[.]"). Plaintiffs have presented no evidence that any other inmate was denied necessary medical care while prison medical staff awaited delivery of records from outside medical providers.

The actions of Nurses Dillman-McGowan and Oxenreider could not create policy, official or otherwise. Moreover, the proof of this single incident, standing alone, is insufficient to create a genuine issue of "custom" or "practice." For these reasons, summary judgment will be entered in favor of PrimeCare on Plaintiffs' Eighth Amendment claim.

V.     **CONCLUSION**

In light of Ms. Neuen's documented peripheral vascular disease, the serious nature of that condition, the failure to provide access to treatment, and the resultant injury, there exists a question of fact concerning Defendants' deliberate indifference to Ms. Neuen's serious medical need. However, because Plaintiffs have not adduced evidence that a relevant policy, custom or practice of PrimeCare caused Ms. Neuen's injuries, the motion for summary judgment will be granted as to Defendant PrimeCare.

An appropriate Order follows.

BY THE COURT:

/s/ Lynne A. Sitarski
LYNNE A. SITARSKI
UNITED STATES MAGISTRATE JUDGE